FILED
2012 Feb-24  PM 03:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| T. MARK MACLIN, as | ) | |
| Administrator *Ad Litem* of the | ) | |
| Estate of David Smith, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. CV-10-S-137-NE |
| | ) | |
| CORRECTIONAL MEDICAL | ) | |
| SERVICES, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, T. Mark Maclin, is proceeding as the Administrator *Ad Litem* for the Estate of David Smith, deceased. Maclin asserted a claim, pursuant to 42 U.S.C. § 1983, for deliberate indifference to his decedent's serious medical needs, in violation of the Eighth and Fourteenth Amendments to the United States Constitution. The remaining defendants are Dr. William Hobbs, a physician at the Limestone Correctional Facility in Limestone County, Alabama; Jimmy Galbreath, a Registered Nurse at the Limestone Correctional Facility; and Correctional Medical Services, the entity that employs both Hobbs and Galbreath. Plaintiff also asserted supplemental state law claims against Hobbs and Galbreath for wrongful death caused by medical negligence (sometimes called "medical malpractice"), in violation of Alabama Code

§§ 6-5-480 *et seq.* and 6-5-540 *et seq.*, and a supplemental state law claim against

Correctional Medical Services for wrongful death caused by negligent and/or wanton

hiring, training, supervision, and retention.[1]  The case presently is before the court on

defendants' motion for summary judgment,[2] and defendants' motion to strike portions

of plaintiff's response to the motion for summary judgment.[3]  Upon consideration of

the motion for summary judgment, briefs, and evidentiary submissions, the court

concludes that the motion is due to be granted.  The motion to strike will be denied

as moot.

## I. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that a court must grant summary

judgment if "the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In

other words, summary judgment is proper "after adequate time for discovery and

---

[1] *See* doc. no. 18 (First Amended Complaint).  Plaintiff's First Amended Complaint also asserted claims for deliberate indifference and wrongful death against individual defendants Billy Mitchem, the Warden of the Limestone Correctional Facility; Charles Hooper, a certified registered nurse practitioner at the Limestone Correctional Facility; Jon Filyaw, a Licensed Practical Nurse at the Limestone Correctional Facility; Lawanda McLin, a Licensed Practical Nurse at the Limestone Correctional Facility; and Yvrose Pierre-Pierre, a Registered Nurse at the Limestone Correctional Facility.  All of those claims have since been dismissed.  *See* doc. no. 40 (Memorandum Opinion and Order dismissing claims against Billy Mitchem); doc. no. 55 (Order dismissing claims against Jon Filyaw); doc. no. 109 (order dismissing claims against Charles Hooper, Lawanda McLin, and Yvrose Pierre-Pierre).

[2] Doc. no. 128.

[3] Doc. no. 145.

2

upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact 'exists only if sufficient evidence is presented favoring the nonmoving party for a jury to return a verdict for that party.'" *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999) (quoting *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1284-85 (11th Cir. 1997)).

"In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983). Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921); s*ee also Anderson v.*

3

*Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II. SUMMARY OF FACTS

David Smith began serving an eighteen-month sentence following his conviction on theft charges at the Limestone Correctional Facility in Limestone County, Alabama, on May 18, 2007.[4]  At all relevant times, defendant Correctional Medical Services, Inc. ("CMS") held the contract to provide health care services to inmates housed by the Alabama Department of Corrections, including those housed at the Limestone Correctional Facility.

All medical care at the Limestone Correctional Facility — including administration of routine medications, treatment of acute illnesses, provision of oxygen and intravenous fluids and medications, and administration of diagnostic tests such as x-rays and blood work — was provided in the Health Care Unit ("HCU"), which was run by CMS employees and housed in a separate building on the correctional facility's campus.[5]  If an inmate required medical care that could not be

---

[4] *See* doc. no. 140 (plaintiff's evidentiary submission), at Exhibit L (Sentencing Order); *id.,* Exhibit Q (Deposition of Eva Raynes), at 28-29.

[5] Doc. no. 130 (defendants' evidentiary submission), Exhibit B (Deposition of Jimmie Galbreath), at 38-41; *id.,* Exhibit H (Deposition of William Hobbs), at 44-47; *id.,* Exhibit A (Deposition of Charles Hooper), at 63-67.

administered at the HCU, he would be transferred to a local hospital.[6]  Some inmates who needed over-the-counter medications (such as Tylenol, allergy medication, or diabetic medication) on a long-term, daily basis were allowed to keep those medications in their cells.  That practice was called "KOP" or "Keep on Person."[7]  Otherwise, all medications were administered from a window at the HCU three times a day:  5:00 a.m., 12:00 p.m., and 5:00 p.m.  Each of those "pill call" periods lasted approximately one to one-and-a-half hours, and an inmate was allowed to come to the HCU anytime during the pill-call periods to receive his medications.[8]  If an inmate was not permitted to leave his cell for security reasons, however, then a nurse, accompanied by a corrections officer, could deliver the medication to the inmate's cell.  Also, if an inmate was physically unable to walk to the HCU for pill call, he could be provided a wheelchair and assistance by a corrections officer to transport him there.[9]  If an inmate missed two or three doses of his prescribed medications, a nurse would notify the doctor or nurse practitioner who wrote the prescription, and that health care provider would counsel the inmate on the need to comply with his

---

[6] Defendants' evidentiary submission, Exhibit E (Deposition of Yvrose Pierre-Pierre), at 44-46.

[7] Hooper Deposition, at 59-60.

[8] Pierre-Pierre Deposition, at 51-52, 57; Hooper Deposition, at 61-62

[9] Hooper Deposition, at 62; Galbreath Deposition, at 89-90; Pierre-Pierre Deposition, at 53; plaintiff's evidentiary submission, Exhibit 4 (Deposition of Mike Hallmark), at 14-16.

prescribed medication regime.[10]

On Wednesday, January 23, 2008, at approximately 7:00 a.m., the plaintiff's decedent, David Smith, went to the HCU on a sick call.[11]  He complained of being light-headed, having a temperature and sore throat, experiencing "serious" chest pains, and coughing up bloody phlegm.  He had a body temperature of 98.0 degrees, a respiratory rate of 20, a pulse of 93, a blood pressure of 124/94, and an oxygen saturation of 93%.  Charles Hooper, the Certified Registered Nurse Practitioner ("CRNP") who examined Smith, testified that the oxygen saturation reading indicated that Smith likely was experiencing some respiratory problem.  When Hooper took an oral history from Smith, he complained of being tired and run down and coughing up brown sputum.  On examination, Hooper noted a red throat with yellow drainage, and wheezing in the bases of Smith's lungs.  He made a preliminary diagnosis of bronchitis and confirmed that diagnosis with Dr. Anwar Jaffrie, the physician on call. Hooper prescribed Augmentin, an antibiotic, three times a day, and Ibuprofen as needed for fever.  Both prescriptions were for a ten-day period.  Hooper also ordered

---

[10] Hooper Deposition, at 39-42; defendants' evidentiary submission, Exhibit D (Deposition of Lawanda McLin), at 41-44.

[11] Although it is not entirely clear from the record, it appears that a sick call is similar to a doctor's appointment at a private facility.  An inmate submits a request for sick call form, and he receives a scheduled time to be seen at the HCU.

chest x-rays and blood work to rule out a more serious condition, like pneumonia.[12] The results of those tests arrived later that afternoon.  The blood work revealed no abnormalities, and the x-ray revealed that Smith's lung fields were clear.  However, the x-ray report did state that the films were out of focus.  The blood and x-ray results led Hooper to confirm his diagnosis of bronchitis.[13]  During his examination of Smith, Hooper saw no signs of malingering or exaggeration of symptoms.[14]

During the remainder of that day and throughout the next four days, Smith had fourteen opportunities to take his prescribed medication:  each day at 5:00 a.m., noon, and 5:00 p.m.[15]  He took advantage of only seven of those opportunities.  CMS records indicate that Smith received both the Augmentin and the Ibuprofen at 5:00 a.m. on January 27, at noon on January 26 and 27, and at 5:00 p.m. on January 23, 24, 26, and 27.  At all other times, Smith did not report for pill call and, consequently, did not receive his medication.[16]  There is, of course, no way to know from the current

---

[12] Hooper Deposition, at 82-88, exhibit 19.  Despite Smith's complaints of chest pains, none of his medical providers appear to have been concerned about a heart condition.  Instead, it appears that the chest pains were associated with Smith's bronchitis.

[13] Hooper Deposition, at 88-91; plaintiff's evidentiary submission, at Exhibit C (X-Ray Report).

[14] Hooper Deposition, at 115-16.

[15] Smith did not go to the HCU until after 5:00 a.m. on January 23, so he did not get any medications at the 5:00 a.m. pill call that day.

[16] Hobbs Deposition, at 80-83; plaintiff's evidentiary submission, at Exhibit D (Medication Administration Record).  Furthermore, as will be discussed later, Smith was housed in the HCU on February 27, so his medications were administered directly to him, without him having to attend pill call.

record why Smith did not show up for pill call more often than he did.  However, one corrections officer testified that inmates might not always hear the announcements for pill call if they are sleeping, or working in an area of the campus that is remote from the speakers.[17]  Also, another inmate testified that the lines for pill call can be very long, and inmates sometimes have to wait outside for as long as an hour, even in cold weather.[18]  It is undisputed, however, that Smith knew or should have known the times for pill call, and there has been no allegation that anyone ever prevented him from attending pill call.

Sometime during the evening of Friday, January 25, 2008, Smith returned to the HCU.  He was accompanied by a fellow inmate, Jonathan Fuller, who thought Smith needed help walking.  Fuller testified that he and Smith walked up to the pill call window, and Fuller told the unidentified female nurse on duty that Smith needed a doctor because he was sick and coughing up blood.  The nurse told Fuller that Smith would have to fill out a sick call form, which would enable Smith to be seen in the infirmary the next day.  When Fuller persisted, an unidentified person working at the HCU informed him and Smith that they would be "locked up" if they did not go back to their dorms.  Smith did not receive any medication during this visit to the

---

[17] Hallmark Deposition, at 64.

[18] Plaintiff's evidentiary submission, Exhibit U (Deposition of Jeffrey Johnson), at 62-64.

HCU because it was not during a pill call window, and he had not been admitted to the HCU.[19]

Eva Raynes, Smith's girlfriend, arrived to visit Smith at 11:15 a.m. on the following day, Saturday, January 26, 2008. Raynes observed Smith shaking and looking very pale. Smith told Raynes that he had been coughing up blood, and that he had been too sick to go to the mess hall for three days. He also told her that he was afraid he was going to die. Because Smith was so sick, Raynes cut her visit short that day, staying only until 1:20 p.m.[20]

While Smith was visiting with Raynes, Nurse Wanda McLin observed the pair walking arm-in-arm in the visitation room. Both Smith and Raynes were smiling, and Smith did not appear to McLin to be in any physical distress.[21] When Smith's visit with Raynes was complete, he had to undergo a routine search to ensure he had not been provided with any contraband. The officer who conducted the search thought Smith looked sick and so informed his Lieutenant, David Tolbert. Smith told Tolbert he did not feel well, and Tolbert agreed that Smith looked sick.[22] At approximately the same time, McLin happened to be walking back through the visitation area on her

---

[19] Plaintiff's evidentiary submission, Exhibit P (Deposition of Jonathan D. Fulmer), at 41-49.

[20] Raynes Deposition, at 56-62.

[21] McLin Deposition, at 93-97.

[22] Defendants' evidentiary submission, Exhibit C (Deposition of David Tolbert), at 16-18.

way from getting a snack.  Tolbert told McLin he had a sick inmate who needed to go to the HCU, and McLin instructed him to send Smith over.  Smith was able to walk to the HCU on his own, but his gait was slow.[23]

Smith arrived at the HCU at 1:40 p.m., and was initially examined by Nurse McLin.  Smith told McLin he had been too sick to make it to the HCU to get his medications.  McLin observed Smith spit up phlegm with small flakes of blood in it. She also took his vital signs, which included a temperature of 101.3 degrees, a respiratory rate of 22, a pulse of 114, a blood pressure of 118/60, and an oxygen saturation of 90%.[24]  McLin concluded, after reviewing Smith's records, that his vital signs had worsened since his last visit to the HCU, primarily because of his elevated temperature.  McLin did not observe any signs that Smith was malingering.[25] Defendant Jimmie Galbreath also examined Smith on January 26.  The only vital sign that caused Galbreath any concern was Smith's elevated temperature.  Galbreath instructed Smith to take all of his medications, including the Ibuprofen, which was for Smith's fever.[26]  Smith requested to receive his antibiotics KOP, but McLin refused, because CMS policy did not allow medications prescribed for shorter than

---

[23] *Id.* at 19-21; McLin Deposition, at 60-61.

[24] McLin Deposition, at 56-62; plaintiff's evidentiary submission, at Exhibit E.

[25] McLin Deposition, at 71, 74-78.

[26] Galbreath Deposition, at 158-62.

a fourteen-day period to be administered KOP.[27]   Smith was discharged from the HCU at 1:45 p.m. and listed as being in "satisfactory" condition.[28]   Defendant Dr. William Hobbs was on duty on January 26, but Galbreath never consulted with Hobbs about Smith's care.   McLin told Hobbs there was a patient in the HCU who had not been taking his medicine, but she did not identify the patient by name.   Hobbs instructed McLin to counsel the patient to take his medication.   Hobbs first testified that, even if he had been consulted about Smith's care, he would not have done anything different, but he later stated that if he had known about all of Smith's medical history and subjective complaints, he might have chosen to admit Smith to the infirmary, depending on what he observed upon examination.[29]

Records of the Alabama Department of Corrections indicate that Smith returned to the HCU, in a wheelchair, during the night hours of the same day, at 10:45 p.m., complaining of flu-like symptoms.   Smith was once again accompanied by fellow inmate Jonathan Fuller.   The records also indicate that Smith was examined by Galbreath and released, but no medical chart was created for that visit, and Galbreath was not questioned about the visit during his deposition.[30]

_____

[27] McLin Deposition, at 69.

[28] Plaintiff's evidentiary submission, at Exhibit E.

[29] Hobbs Deposition, at 74-78, 136.

[30] Plaintiff's evidentiary submission, at Exhibit F (Duty Post Log); Fulmer Deposition, at 37-42.

Smith returned to the HCU between 4:45 and 5:05 a.m. on Sunday, January 27, 2008.   He informed Yvrose Pierre-Pierre, the nurse on duty, that he had been diagnosed with bronchitis, but he had not been taking his medications regularly.   He also reported that he could not breathe when he walked, and that he had difficulty standing in line for his medications, so he needed a wheelchair.   Upon examination, Smith had a temperature of 98.3 degrees, a respiration rate of 20, a pulse of 107, a blood pressure of 90/60, and an oxygen saturation of 95%.   His color was good, his lungs were clear, and he had no signs of respiratory distress.   He was coughing blood-tinged sputum.   Pierre-Pierre administered the medications Smith had previously been prescribed (Augmentin and Ibuprofen), and instructed Smith to comply with his medication regime in the future.   She also advised Smith to return to the HCU if his bleeding worsened.   Smith was released from the HCU in "satisfactory" condition.[31] The record does not clearly indicate whether Smith was provided with the wheelchair he said he needed.

Officer Mike Hallmark arrived to work at the Limestone Correctional Facility later that same morning, at 6:00 a.m. on Sunday, January 27, 2008, and he was assigned to Smith's dorm.   Another inmate, Jason Goodson, told Hallmark that Smith was about to die, so Hallmark went to Smith's cell to check on him.   Smith was pale

---

[31] Pierre-Pierre Deposition, at 74-84; plaintiff's evidentiary submission, at Exhibit G.

and looked "in bad shape."  Hallmark saw blood all over Smith's cell, including on the walls.  He also saw Smith holding a blood-soaked towel to his mouth.  Hallmark asked Smith where all the blood came from, and Smith responded that he had coughed it up.  Hallmark also observed Smith coughing more blood into the towel. Smith told Hallmark he had already been to the HCU that day, but an unspecified member of the nursing staff had told him that if he came back, he would be disciplined.  Hallmark concluded that Smith needed immediate medical help and took him to the HCU.  Hallmark walked slowly on the way to the HCU, and he coughed throughout the walk, but he did not require a wheelchair or other assistance walking.[32]

Officer Terry Walker was working at the front desk of the HCU when Officer Hallmark brought Smith there on the morning of January 27.[33]  Walker witnessed a discussion between Hallmark and a black female nurse about whether Smith should be admitted to the HCU.  The nurse said that she was not going to do anything for Smith because he had not been taking his medication, and the symptoms Smith was experiencing were typical for someone who did not take his medication.  She also said that Smith would have to wait in the lobby because she was not going to ask a

---

[32] Hallmark Deposition, at 23-32. In plaintiff's brief, he misstates Hallmark's testimony as identifying Galbreath as the member of the nursing staff who informed Smith he would be disciplined if he returned to the HCU.  Instead, Hallmark merely testified that a member of the nursing staff told Smith that; he did not identify the person by name.  *See id.* at 25.

[33] Plaintiff's evidentiary submission, Exhibit V (Deposition of Terry Walker), at 24-26.

doctor to come to the HCU early on a Sunday morning for a patient who would not take his medication.[34]  Officer Hallmark did not want to take Smith back to his cell, because he thought all the blood Smith was coughing up was a health hazard, so he contacted his supervisor, Sergeant Anthony Hatcher, who placed a "hold" on Smith that would require the HCU to house him.[35]  Hallmark then left Smith sitting in the lobby of the HCU and returned to his duty station.[36]  Walker could not remember how long Smith sat in the lobby before being called back to the infirmary by one of the nurses.[37]  However, Troy Hughes, another correctional officer on duty in the HCU on January 27, 2008, testified that he showed Smith to a bed in the infirmary before defendant Galbreath arrived to work at approximately 7:30 to 8:00 a.m.[38]  Officer Hughes worked from 6:00 a.m. to 2:00 p.m. that day.  During that shift, Hughes observed Smith going out to the exercise yard on at least one occasion.[39]

---

[34] Hallmark Deposition, at 33-34; Walker Deposition, at 24-25.  Officer Troy Hughes also witnessed two female nurses stating they were angry that Department of Corrections officials had forced them to house Smith.  Defendants' evidentiary submission, Exhibit F (Deposition of Troy Hughes), at 22-25.

[35] Hallmark Deposition, at 34.

[36] *Id.* at 34-39.

[37] Walker Deposition, at 25, 37, 41.

[38] Hughes Deposition, at 26-41.  Galbreath testified that he arrived to work at 7:00 a.m. on January 27.  Galbreath Deposition, at 77-78, 198.  Whether Galbreath arrived at 7:00, 7:30, or 8:00 is not material to the disposition of plaintiff's claims.

[39] Hughes Deposition, at 32.  Defendants state in their statement of facts that Smith smoked a cigarette while he was outside in the exercise yard, but there is no evidence to support that statement.  Hughes testified that he could not remember whether or not Smith smoked a cigarette.

14

Galbreath was the charge nurse who relieved Pierre-Pierre the morning of January 27, 2008.  When Galbreath arrived to work at approximately 7:30 to 8:00 a.m., Pierre-Pierre informed him that Smith had been placed in the infirmary on a hold from the Department of Corrections.[40]  Galbreath worked two shifts on January 27: one from approximately 7:00 a.m. to 3:00 p.m., and another from approximately 3:00 p.m. to 11:00 p.m.  He examined Smith at least once during both of those shifts. Smith had temperatures of 102.08 degrees in the morning, 99.0 degrees at midday, and 98.2 degrees in the afternoon.  His pulse was 140 in the morning and 138 in the afternoon.  His respiration rate was 22 in the morning, 20 at midday, and 18 in the afternoon.   His blood pressure was 124/80 in the morning and 120/70 in the afternoon.  His oxygen saturation was 86% in the morning and 88% in the afternoon. Galbreath noted during both shifts that all of Smith's bodily systems, except his respiratory system, were normal upon examination.   Smith had rapid, shallow respirations and rhonchi in his left lower lung.  His cough was dry and non-productive, but he could force a cough that would produce a minimal amount of pink liquid.  Galbreath provided Smith with an incentive spirometer to assist in his respiration, and he noted that Smith was experiencing tremendous anxiety.[41]

---

[40] Pierre-Pierre Deposition, at 98.

[41] Galbreath Deposition, at 110-32; plaintiff's evidentiary submission, at Exhibits I & J.

15

Galbreath testified that he was only required to document a patient's vital signs once during each shift, but he may have examined Smith more times than that. He did not remember exactly how many times he examined Smith on January 27.[42]

A nurse or doctor making rounds in the HCU must be accompanied by a corrections officer. Officer Troy Hughes accompanied Galbreath on all rounds Galbreath made before the end of Hughes's shift at 2:00 p.m. on January 27. Hughes observed Galbreath taking Smith's vital signs first thing in the morning, at approximately 7:30 or 8:00 a.m. At that time, Smith was still coughing, but he was only spitting a clear, foamy substance into his towel.[43] At approximately 9:00 a.m., Smith came to the door of the room in which he was housed to get Hughes's attention. Smith told Hughes he couldn't breathe, and Hughes assumed he was having an anxiety attack, so he told Smith to take slow, controlled breaths and lie back down. Smith complied.[44] Hughes told Galbreath what had happened, so Galbreath went to examine Smith again. When Galbreath asked Smith what was wrong with him, Smith responded, "nothing." Galbreath listened to Smith's chest, but there is no evidence that he administered any other treatment at that time.[45]

---

[42] Galbreath Deposition, at 131-32.

[43] Hughes Deposition, at 42-43.

[44] *Id.* at 48-55.

[45] *Id.* at 55-63.

Galbreath also administered Smith's medications at 9:00 a.m., and after Smith took those medications, he told Galbreath that he felt better.[46]   Galbreath again administered Smith's medications at 1:00 p.m.  He also entered the room where Smith was housed on several other occasions to perform an informal check on the inmates. Galbreath would ask something like, "Everybody okay?," and if an inmate had a problem, he would treat it.  Galbreath listened to Smith's chest during at least one of those informal checks.[47]  All in all, Hughes testified that Galbreath checked on Smith, took his vital signs, listened to his lungs, and administered medications on multiple occasions between 6:00 a.m. and 2:00 p.m.   During that shift, Hughes never witnessed Galbreath refusing to see or treat Smith, or failing or refusing to provide any specific type of medical care requested by Smith.[48]

Officer Everett Biffle took over Hughes's shift at the HCU at 2:00 p.m. on January 27.  Biffle accompanied Galbreath on his rounds at 4:00 p.m. and 8:00 p.m.[49] During each round, Galbreath administered medication and took vital signs of all the

---

[46] *Id.* at 69, 73.

[47] *Id.* at 71-80.

[48] *Id.* at 132-33.

[49] Biffle initially testified that it was a female nurse who performed rounds on January 27, but then later stated that he could not recall if the nurse was a man or woman.  *See* defendants' evidentiary submission, Exhibit G (Deposition of Everett Biffle), at 14, 16, 23, 53.  It is undisputed, however, that Galbreath was the charge nurse on duty that day.

inmates, including Smith.[50]  During Biffle's shift, which lasted until 10:00 p.m. on February 27, he never witnessed Galbreath refusing to provide any medical care to Smith.[51]

Nurse Pierre-Pierre returned for duty at the HCU at approximately 9:30 p.m. on January 27.  She relieved Galbreath at the end of his two shifts.  Galbreath reported to Pierre-Pierre that Smith had had a quiet day, was stable, and had not raised any more complaints.[52]  When Pierre-Pierre made her rounds in the early morning hours, at approximately 12:15 a.m. on Monday, January 28, she found Smith dead on his bed in the HCU.[53]  The autopsy revealed an amount of fluid in Smith's left lung cavity that was on the high end of the normal range.[54]  Smith's lungs themselves were much heavier than normal, indicating inflammation, and they demonstrated other signs consistent with pneumonia.[55]  Post-mortem blood tests revealed an infection in Smith's system.[56]  The official cause of death was determined

---

[50] *Id.* at 17-28.

[51] *Id.* at 48-49.

[52] Pierre-Pierre Deposition, at 117.

[53] *Id.* at 103-106; plaintiff's evidentiary submission, at Exhibit K.

[54] Plaintiff's evidentiary submission, Exhibit X (Deposition of Stephanie D. Reilly, M.D.), at 19-20.

[55] *Id.* at 25-28.

[56] *Id.* at 56.

to be pneumonia and probable sepsis.[57]

## III. DISCUSSION

### A.    Claims Abandoned by Plaintiff

Defendants moved for summary judgment on all claims, except plaintiff's state law claim for medical malpractice against defendant William Hobbs, M.D.[58]  In response to defendants' motion, plaintiff acknowledged that summary judgment should be granted on his claims against defendants Correctional Medical Services and William Hobbs, M.D., for deliberate indifference to serious medical needs.[59]  Thus, the only claims remaining to be addressed in this opinion are plaintiff's federal claim for deliberate indifference to serious medical needs against defendant Jimmie Galbreath, R.N., plaintiff's supplemental state law claim for medical malpractice against Galbreath, and plaintiff's supplemental state law claim for negligent training against defendant Correctional Medical Services, Inc.

### B.    Deliberate Indifference to Serious Medical Needs

Deliberate indifference to a prisoner's serious medical needs is a violation of

---

[57] *Id.* at 35-36.  One medical dictionary defines "sepsis" as "the presence in the blood or other tissues of pathogenic microorganisms or their toxins."  *Dorland's Illustrated Medical Dictionary* 1681 (30th ed. 2003).

[58] *See* doc. no. 129 (defendants' brief in support of summary judgment).

[59] *See* doc. no. 139 (plaintiff's response brief), at 24 n. 8 ("Plaintiff hereby consents to the Court entering an Order granting Defendants [sic] CMS, Inc. and Defendant William Hobbs, M.D.'s Motion [for Summary Judgment] as to claims of Deliberate Indifference.") (bracketed alteration supplied).

the Eighth Amendment.  *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  To prevail on his deliberate indifference claim, plaintiff must show:  (1) a serious medical need; (2) defendants' deliberate indifference to that need; and (3) a causal link between the defendants' indifference and his injury.  *Mann v. Taser International, Inc.*, 588 F.3d 1291, 1306-07 (11th Cir. 2009).  In order to establish the deliberate indifference element, a plaintiff must show: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence." *Townsend v. Jefferson County*, 601 F.3d 1152, 1158 (11th Cir. 2010) (internal quotation marks and alteration omitted).

With respect to the "subjective knowledge" component, the Eleventh Circuit has held that a defendant "must *both* be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* must also draw the inference." *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005) (emphasis in original) (citation, internal quotation marks, and alteration omitted).  "No liability arises for 'an official's failure to alleviate a significant risk that he should have perceived but did not . . . .'" *Burnette v. Taylor*, 533 F.3d 1325, at 1331 (11th Cir. 2008) (omission in original) (quoting *Farmer v. Brennan*, 511 U.S. 825, 825 (1994)).

In determining whether a delay in treatment rises to the level of deliberate indifference, in the sense that the defendant had a "sufficiently culpable state of

mind," *Farmer*, 511 U.S. at 834 (citation and internal quotation marks omitted) — *i.e.*, that the defendant's actions or omissions constituted "more than gross negligence" — relevant factors include: "(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay." *Goebert v. Lee County*, 510 F.3d 1312, 1327 (11th Cir. 2007). The defendants' response to indications that a prisoner may need medical attention must have been "poor enough to constitute 'an unnecessary and wanton infliction of pain,' and not merely accidental inadequacy, 'negligen[ce] in diagnosi[s] or treat[ment],' or even '[m]edical malpractice' actionable under state law." *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (alterations in original) (quoting *Estelle*, 429 U.S. at 105-06).

It is undisputed that Smith had a serious medical need. He was diagnosed with bronchitis on January 23, 2008, and, according to the autopsy report, that condition had progressed to pneumonia by the time of his death on January 28. Even so, plaintiff cannot prove that defendant Galbreath demonstrated deliberate indifference to Smith's medical needs. There is no evidence that Galbreath was subjectively aware that Smith was at risk of serious harm if he did not receive additional or different treatment, and no evidence that Galbreath disregarded any such risk by conduct that was more than gross negligence.

Plaintiff first asserts that Smith was "critically ill when he returned to the HCU

on Friday, January 25th."[60]  The evidence does not support that assertion.  Smith walked to the HCU on the evening of January 25, albeit with the assistance of a fellow inmate, Jonathan Fuller.  Smith was sick and coughing up blood, but there is no evidence that his condition was "critical," as plaintiff alleges.  Furthermore, even if plaintiff had been "critically ill" on Friday, January 25, there is no evidence that Galbreath was aware of the extent of Smith's illness, either subjectively or objectively.  Fuller testified that he and Smith were turned away from the HCU by a female nurse.  Galbreath is male.  There is no evidence that either Fuller or Smith spoke to Galbreath that night, or that Galbreath otherwise became aware of Smith's visit to the HCU.

Plaintiff also asserts that Smith's condition continued to worsen on Saturday, January 26th, such that by Sunday, January 27th, he needed "immediate and definative [sic] medical intervention to survive."[61]  There is, indeed, evidence that Smith was sick on Saturday, January 26th.  He was seen at the HCU at approximately 1:40 p.m., at which time he had an elevated temperature and was spitting up blood.  Nurse Lawanda McLin even concluded that Smith's condition had become worse since his first visit to the HCU on January 23rd, but there still is no evidence that

---

[60] Doc. no. 139 (plaintiff's response brief), at 24.

[61] *Id.*

22

Galbreath subjectively believed Smith was at risk of suffering serious harm. To the contrary, the evidence indicates that the most concerning thing Galbreath observed about Smith was his elevated temperature of 101.3 degrees. Galbreath instructed Smith to comply with his medications and discharged him in satisfactory condition. This evidence indicates that Galbreath did not subjectively believe that Smith suffered from anything more severe than bronchitis, a fairly common and relatively mild medical condition. Further, although there is some evidence that Smith returned to the HCU at 10:45 p.m. on the evening of January 26th, and that he was examined by Galbreath, there is no record of what occurred during that examination, or what treatment was administered. Consequently, there is no way of knowing either Smith's vital signs or what Galbreath subjectively believed about Smith's condition at 10:45 p.m. on Saturday, January 26, 2008.

Finally, there is no evidence that Galbreath was subjectively aware, on Sunday, January 27, 2008, that Smith needed immediate medical treatment in order to survive. Galbreath did not examine Smith until sometime after Smith had been admitted to the HCU on January 27th. Smith's temperature and pulse were elevated in the morning, but they decreased slightly as the day went on. His other vital signs (including respiratory rate and oxygen saturation) indicated that he was experiencing a respiratory problem, which was consistent with his previous diagnosis of bronchitis.

23

Although correctional officer Troy Hughes did observe Smith experiencing what he believed to be an anxiety attack, Smith told Galbreath that "nothing" was wrong when Galbreath examined him soon thereafter.  Smith also told Galbreath that he felt better after taking his medication.  Furthermore, when Nurse Yvrose Pierre-Pierre relieved Galbreath at the end of his shifts on the evening of January 27th, Galbreath informed her that Smith had a quiet day, was stable, and had not voiced any more complaints. Again, all of this evidence indicates that Galbreath was not subjectively aware that Smith suffered from anything more severe than the bronchitis, for which he already was being treated.

Furthermore, even if Galbreath had subjectively perceived a risk of serious harm to Smith, there is no evidence that he disregarded any such risk.  Plaintiff argues that Galbreath repeatedly declined to treat Smith, but the evidence does not support that assertion.  Although there is evidence that Smith was turned away from the HCU on more than one occasion without treatment, there is no evidence that Galbreath himself ever made the decision to turn him away.  To the contrary, the evidence indicates that Galbreath provided Smith with medical treatment each time he encountered Smith in the HCU.  On the afternoon January 26th, Galbreath examined Smith, administered medications, and advised Smith to take all of his medications in the future.  There is no evidence about what Galbreath did when Smith returned to the

24

HCU later that night, but that lack of evidence cannot be construed to mean that Galbreath did not treat plaintiff.  Finally, on Sunday, January 27th, after Smith was admitted to the HCU, Galbreath repeatedly examined Smith, took his vital signs, and administered his medications.  He responded to Officer Hughes's report that Smith was having a panic attack by examining Smith shortly thereafter, but Smith told Galbreath that nothing was wrong with him.  In short, there is no evidence that Galbreath ever refused to treat Smith at any time.

Finally, there is no evidence to support a characterization of Galbreath's actions as more than gross negligence, if that.  Plaintiff argues that Galbreath was punishing Smith for returning to the HCU even though he had not been taking his medications.[62]  The evidence only indicates that Galbreath counseled Smith to take all of his medications as prescribed.[63]  That is appropriate, even medically necessary, behavior.  Indeed, it likely would constitute nursing malpractice to *not* provide such counsel to a patient with a history of medication non-compliance.

---

[62] *Id.* at 27-28.  Plaintiff actually describes Galbreath's behavior as "psychopathic," and asserts that it is "probably better characterized [as] malicious and/or vindictive." *Id.*  There is absolutely no evidence to support these severe allegations.  The court is surprised at the willingness of plaintiff's counsel to make such unfounded negative representations about the character of an opposing litigant, and strongly cautions plaintiff to avoid such reckless ethical behavior in the future.

[63] It is true that Officer Walker testified that, on the morning of January 27, a member of the HCU nursing staff said plaintiff would have to wait in the lobby because she was not going to call a doctor to come in early for a patient who had been neglecting to take his medication.  Irrespective of whether such a comment could be used as evidence to support a claim of deliberate indifference, Walker testified that the nurse making those comments was a black female.  Galbreath is male.

In summary, there is no evidence that defendant Jimmie Galbreath demonstrated deliberate indifference to Smith's serious medical needs. Plaintiff's arguments amount to no more than disagreement with the *manner* in which Smith was treated. Plaintiff would have preferred for Galbreath to have consulted with a doctor or nurse practitioner about Smith's care, suggested additional chest x-rays or other diagnostic testing, or admitted Smith to the HCU infirmary prior to the morning of Sunday, January 27th. The law is clear, however, that neither a prisoner's disagreement with his medical providers' decisions, nor his preference for a different course of treatment, can support a claim for *deliberate indifference* to serious medical needs. *See McElligott v. Foley,* 182 F.3d 1248, 1259 (11th Cir. 1999) (distinguishing claims "that different treatment should have been provided, which is tantamount to a medical judgment call," from claims that "the treatment provided was grossly inadequate, amounting to no treatment at all"). It is clear that Galbreath was attentive to, and administered treatment to, Smith, even if the treatment was not ultimately successful. Even if Galbreath should have made different decisions — indeed, even if his actions or inactions constituted medical malpractice under state law[64] — the decisions he did make reflect no more than mere negligence and, absent any

---

[64] These statements should not be construed as a holding, or even a suggestion, that Galbreath's conduct did constitute medical malpractice under state law. Plaintiff asserted a separate claim for medical malpractice, and that claim must be considered separately, as discussed more fully below.

additional proof of Galbreath's deliberate disregard of a subjectively perceived risk of serious harm, his actions cannot support a claim for *deliberate indifference* to serious medical needs in violation of the Eighth Amendment.  *See id.* at 1256 (holding that, while a failure to diagnose colon cancer "can be deemed extremely negligent, it does not cross the line to deliberate indifference"); *Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").[65]

Summary judgment is due to be granted on plaintiff's Eighth Amendment claim for deliberate indifference to his decedent's serious medical needs.

## C.    State Law Claims

Jurisdiction over plaintiff's remaining claims — for medical practice against Galbreath and Hobbs, and negligent training against Correctional Medical Services (Counts II & III, respectively, of plaintiff's First Amended Complaint) — was based upon 28 U.S.C. § 1367, the statute governing supplemental jurisdiction over state law claims.  In cases where the court's jurisdiction is based solely upon a federal question,

---

[65] Additionally, to the extent that plaintiff complains of the rules and procedures adopted by CMS and/or the Alabama Department of Corrections (including only administering medications during pill call, only allowing KOP for prescriptions lasting fourteen days or more, or requiring inmates to fill out a sick call form before being seen by a nurse or doctor), those policies have nothing to do with Galbreath's subjective state of mind while treating (or failing to treat) Smith. Stated differently, Galbreath should not be held personally liable for any harm suffered by Smith as a result of Galbreath's following policies adopted by his employer or the Department of Corrections.

the district court has discretion to entertain state claims that are "supplemental" to the

federal claim.  See 28 U.S.C. § 1367(a).  The district court may decline to exercise

supplemental jurisdiction when:

> (1)   the claim raises a novel or complex issue of state law,

> (2)   the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

> (3)   *the district court has dismissed all claims over which it has original jurisdiction*, or

> (4)   in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c) (emphasis supplied). The Supreme Court added a gloss to this

statutory language in *Carnegie-Mellon University v. Cohill*, 484 U.S. 343 (1988),

when observing that

> a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendant [now "supplemental"] state-law claims.  When the balance of these factors indicates that a case properly belongs in state court, *as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain*, the federal court *should decline* the exercise of jurisdiction by dismissing the case without prejudice.

*Id*. at 349-50 (emphasis supplied) (citing *United Mine Workers of America v. Gibbs*,

383 U.S. 715, 726-27 (1966)).  "[I]n the usual case in which all federal-law claims are

eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon*, 484 U.S. at 350 n.7; *see also L.A. Draper & Son v. Wheelabrator-Frye, Inc.*, 735 F.2d 414, 428 (11th Cir. 1984) (stating that "if the federal claims are dismissed prior to trial, *Gibbs* strongly encourages *or even requires* dismissal of state claims") (emphasis supplied).

Here, plaintiff's federal claims have been eliminated, and there is no independent basis for this court to assert jurisdiction over plaintiff's state law claims.[66] Accordingly, this court must decline supplemental jurisdiction over the remaining state law claims, and will exercise its discretion to dismiss those claims.

### IV. CONCLUSION AND ORDER

In accordance with the foregoing, defendants' motion for summary judgment is GRANTED. Plaintiff's claim for deliberate indifference to serious medical needs pursuant to the Eighth Amendment to the United States Constitution (Count I of the

---

[66] Plaintiff cannot assert federal jurisdiction based on satisfaction of the requirements of the diversity statute, 28 U.S.C. § 1332, because complete diversity of citizenship is not present. *See* 28 U.S.C. § 1332(a)(1) (requiring that, in addition to an amount in controversy exceeding $75,000, the civil action must be between "citizens of different States"). Plaintiff is a resident of Alabama, as are defendants Galbreath and Hobbs. *See* Complaint, at ¶ 6 ("Plaintiff T. Mark Maclin . . . is a duly licensed practicing attorney over the age of nineteen and is a resident of Alabama."); Galbreath Deposition, at 11 (stating that Galbreath's residence is in Hartselle, Alabama); Hobbs Deposition, at 11 (stating that Hobbs's residence is in Elkmont, Alabama).

First Amended Complaint), against all defendants, is DISMISSED with prejudice.

Plaintiff's state law claim for medical malpractice against defendants Jimmie Galbreath and William Hobbs (Count II of the First Amended Complaint) is DISMISSED without prejudice.  Plaintiff's state law claim for negligent training against defendant Correctional Medical Services, Inc. (Count III of the First Amended Complaint) also is DISMISSED without prejudice.

As the testimony addressed in defendants' motion to strike was offered in support of plaintiff's state law claims for medical malpractice and negligent training, and those claims have now been dismissed, the motion to strike is DENIED as moot.

Costs incurred herein are taxed to the party who, or which, incurred them.  The Clerk is directed to close this file.

DONE this 24th day of February, 2012.

_____
United States District Judge